IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JIMMY LEE WEBB,                          )
AIS #137198,                             )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        CIVIL ACTION NO. 2:14-CV-327-WHA
                                         )
BRANDON BOYD, et al,                     )
                                         )
        Defendants.                      )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This 42 U.S.C. § 1983 action is pending before the court on a complaint filed by
Jimmy Lee Webb, a state inmate, challenging actions which occurred at the Bullock
Correctional Facility in March and April of 2014.   Webb names Brandon Boyd, his
classification specialist, and Rene Mason, a deputy warden at Bullock during the time
relevant to the complaint, as defendants.

In the instant complaint, Webb alleges that his placement in administrative
segregation occurred because of fabricated/false information compiled by Boyd with
respect to "an . . . 'enemy situation' between me and inmate Jonathan Yancey due to a
lawsuit I filed against him . . ." *Complaint - Doc. No. 1* at 3.  Webb further alleges that the
defendants placed him in administrative segregation in retaliation for his filing the prior
lawsuit.  *Id*.  Finally, Webb complains that the defendants denied him a lower custody
classification in violation of his due process rights.  *Affidavit in Support of Complaint -*

*Doc. No. 1-1* at 1-2.  Webb seeks a declaratory judgment, injunctive relief and monetary damages for the alleged violations of his constitutional rights.  *Complaint - Doc. No. 1* at 5.

The defendants filed a special report and supporting evidentiary materials addressing Webb's claims for relief.  In these documents, the defendants deny they retaliated against Webb and argue they did not otherwise violate Webb's constitutional rights with respect to either the determination to place him in segregation or the decision to deny him a more favorable custody classification.

Upon receipt of the defendants' special report, the court issued an order directing Webb to file a response to the report, including affidavits, sworn statements or other evidentiary materials.  *Order of June 30, 2014 - Doc. No. 20* at 2.  This order specifically cautioned Webb that unless "**sufficient legal cause**" is shown within fifteen days of entry of this order "**why such action should not be undertaken**, . . . the court may at any time [after expiration of the time for his filing a response to this order] and **without further notice to the parties** (1) treat the special report and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." *Id*. at 2-3.  Webb filed an unsworn response in opposition to the defendants' report.  *See Doc. No.* 21.

Pursuant to the aforementioned order, the court deems it appropriate to now treat the defendants' report as a motion for summary judgment.  Thus, this case is now pending

on the defendants' motion for summary judgment.  Upon consideration of the defendants' motion for summary judgment, the evidentiary materials filed in support thereof, the sworn complaint and the response filed by Webb, the court concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (moving party has initial burden of showing there is no genuine dispute of material fact for trial).

---

[1]Although stylistic changers were made to Rule 56 in December of 2010, the revision of "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*.  "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Despite these changes, the substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact with respect to the claims presented by the plaintiff. Based on the foregoing, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-594 (internal quotation marks omitted) (Once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.). This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). A genuine dispute of material fact exists when the nonmoving party produces

evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Public Education for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007).

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted). To proceed beyond the summary judgment stage, an inmate-plaintiff is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*. "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions . . .,

in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment[.]"); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (summary judgment appropriate where no genuine dispute of material fact exists).  At the summary judgment stage, this court must "consider all evidence in the record . . . [including] pleadings, depositions, interrogatories, affidavits, etc. -- and can only grant summary judgment if everything in the record demonstrates that no genuine [dispute] of

material fact exists." *Strickland v. Norfolk Southern Railway Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. ZenithRadio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a

requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by appropriate and sufficient evidence a genuine dispute of material fact.  *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Webb v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Thus, the plaintiff's *pro se* status does not mandate this court's disregard of elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of all the evidence contained in the record.  After such review, the court finds that Webb has failed to demonstrate a genuine dispute of material fact in order to preclude the entry of summary judgment in favor of the defendants.

### III.  ABSOLUTE IMMUNITY

To the extent Webb sues the defendants in their official capacities, they are immune from monetary damages.  Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's

immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities."  *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing and under the facts of this case, the defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.  *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

## IV.  DISCUSSION

On March 31, 2014, during an annual classification review of Jonathan Yancey, AIS #130582, defendant Boyd discovered that Jonathan Yancey had also been incarcerated under the name Joe Nathan Yancey, AIS #141474.  Boyd then discovered a document indicating that the Enemies Committee at Staton validated Webb as an enemy of Jonathan Yancey, a.k.a, Joe Nathan Yancey, on January 6, 1986. *Defendants' Exh. A - Doc. No. 19-1 at 9.*  Based on this information, Boyd immediately undertook a review of Webb's prison file which established that Webb likewise identified Yancey as an enemy and had done so at least as early as May 13, 2002. *Id*. at 22.  Upon questioning by Boyd on March 31, 2014, Yancey acknowledged that he remained listed as an enemy for Webb. *Defendants' Exh. B*

- *Doc. No. 19-2* at 5.  In a written statement dated April 4, 2014, Yancey explained that "back in 2007" he believed Webb had advised law enforcement officials that he was involved with several burglaries in Lee County, Alabama, "so when I [first] run into him in prison we got into it[.]" *Defendants' Exh. B - Doc. No. 19-1* at 5.  Yancey, however, further advised that he had avoided Webb while they were at Bullock and he no longer considered Webb an enemy.  *Id*.  Yancey also acknowledged that he is known by the name "Joe-Nathan" because that is "the way [people] pronounce my name[.]"  *Id*.  The records contained in the institutional files of inmates Webb and Yancey and the statement provided by Yancey on April 4, 2014 demonstrate that the validation of these inmates as enemies remained effective on the date correctional officials placed Webb in administrative segregation - March 31, 2014.

Upon his initial determination that Webb and Yancey were enemies and both housed in general population at Bullock, Boyd undertook action to transfer Webb to administrative segregation to ensure his immediate safety and security so that the documented enemy situation could be further investigated.  Inmate Webb received a Detention Notification on March 31, 2014 advising that his placement in administrative segregation occurred for "security reasons[.]" *Defendants' Exh. A - Doc. No. 19-1* at 4.  Webb gained his release from administrative segregation on April 8, 2014.  *Defendants' Exh. C - Doc. No. 19-3* at 3.[2]

---

[2] Webb acknowledges that he spent only "eight days" in segregation.  *Doc. No. 1-1* at 7.

Initially, Webb alleges that Boyd fabricated the enemy situation with inmate Yancey in retaliation for his filing a prior federal lawsuit against Webb. Webb then asserts that Boyd and Mason effectuated his placement in administrative segregation based on this fabricated/false information. Webb next argues that his placement in administrative segregation was likewise in retaliation for his filing the previous lawsuit. Finally, Webb complains that Boyd and Mason denied him placement in a lower custody classification. The defendants adamantly deny they acted in violation of Webb's constitutional rights.

### A. False/Fabricated Information

Webb complains that the defendants relied on false/fabricated information regarding an enemy situation with inmate Yancey to place him in administrative segregation on March 31, 2014. The defendants deny this allegation and maintain that the information utilized in determining that Webb should be temporarily placed in administrative segregation was true and correct at the time of the challenged action. Specifically, defendant Boyd addresses Webb's allegations as follows:

> . . . Inmate Webb's enemy situation was not fabricated. There was proper documentation indicating that an enemy situation had occurred in Inmate Jonathan Yancey's (130582) institutional file involving Inmate Webb (137198). Enemy documentation in Inmate Yancey's [prison file] stated that Inmate Jimmy Lee Webb was the valid enemy of Inmate *Joe Nathan Yancey (141474)*. . . . When Inmate Webb and Inmate Yancey were together at Staton Annex, Inmate Webb started a fight with Inmate Yancey. Following the altercation, Inmate Webb refused to sign a "Living Agreement" stating the two of them could not live in population together. Consequently, an Enemy Validation Committee declared Inmate Yancey and Inmate Webb enemies indicating that the two inmates should not be placed in population together.
> During Inmate Yancey's Annual progress review on 3/31/14, I discovered that Inmate Yancey had previously been sentenced under the

name *Joe Nathan Yancey* with an Alabama Institutional Serial number (AIS) of 141474.  It was on this date that I discovered Inmate *Jonathan Yancey* (130582) and Inmate *Joe Nathan Yancey* (141474) were the same person. While reviewing [the institutional] files [of both Yancey and Webb] I discovered the enemy validation between Inmate Webb and Inmate Yancey. Security [at Bullock] was immediately notified of the situation and separated the two inmates by placing Inmate Webb in the Segregation Unit.  Inmate Webb was placed in Segregation for "security reasons."  Inmate Webb was given a Detention notification which was signed by Inmate Webb on 3/31/14 indicating the reason why he was being placed in Segregation.

*Defendants' Exh.  A - Doc. No. 19-1* at 1-2 (emphasis in original).

In *Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991), the Court held that reliance on ***admittedly false information*** to deny a prisoner consideration for parole was arbitrary and capricious treatment violative of the Constitution.   The appellate court, however, carefully distinguished its holding in *Monroe* from its prior decision in *Slocum v. Georgia State Bd. of Pardons and Paroles*, 678 F.2d 940 (11th Cir.), *cert. denied*, 459 U.S. 1043 (1982).

Our holding today does not conflict with our earlier holding in *Slocum*, *supra*.  In *Slocum*, the plaintiff, who had been denied parole, made the conclusory allegation that the Board must have relied upon erroneous information because otherwise the Board would surely have granted him parole.  *Slocum*, 678 F.2d at 941.  The plaintiff then sought to assert a due process right to examine his prison file for the alleged errors.  Unlike the instant case, in *Slocum* the state did not admit that it had relied upon false information in denying parole nor did the plaintiff present any evidence that his prison file even contained any false information.  We held in *Slocum* that prisoners do not state a due process claim by merely asserting that erroneous information may have been used during their parole consideration.  *Id.* at 942.  We also determined that prisoners do not have a due process right to examine their prison files as part of a general fishing expedition in search of false information that could possibly exist in their files.  *Id*.  In the case at bar, we are confronted with prison authorities who admit that information contained in Monroe's files is false and that they relied upon such information, at least in part, to deny Monroe parole and to classify him as a

> sex offender.  As we stated, the parole statute does not authorize state
> officials to rely on knowingly false information in their determinations.
> *Thomas [v. Sellers]*, 691 F.2d [487] at 489 [(11th Cir. 1982)].

*Monroe*, 932 F.3d at 1442.  *Slocum* controls the disposition of the instant false information

claim.

The defendants maintain that the information utilized in the decision to place Webb

in administrative segregation on March 31, 2014 was true and that reliance on this

information did not infringe on any of his constitutional rights.  Of specific importance,

there is no admission by the defendants that the information used when deciding to place

Webb in segregation was false, fabricated, incorrect or erroneous.  Webb has failed to come

forward with any evidence which indicates that the defendants knowingly used false or

fabricated information when placing him in segregation.  Moreover, Webb's conclusory

allegation regarding the use of fabricated information does nothing more than raise the

possibility that information in his records may be false and this mere possibility fails to

provide a basis for relief.  *Monroe*, 932 F.2d at 1142; *Jones v. Ray*, 279 F.3d 944 (11th Cir.

2001) ("[P]risoners cannot make a conclusory allegation regarding the use of [false]

information as the basis of a due process claim.").

The record in this case establishes that the defendants did not rely on ***admittedly***

false or fabricated information in deciding to temporarily place Webb in administrative

segregation.  Consequently, Webb is entitled to no relief as a matter of law and entry of

summary judgment in favor of the defendants on this claim is warranted.

## B.  Retaliation

Webb alleges that Boyd fabricated information regarding the enemy situation with inmate Yancey and Boyd and Mason ordered his placement in segregation all because he had filed a previous lawsuit with this court.  The defendants fervently deny taking any action against Webb in retaliation for his filing a lawsuit.  Instead, the defendants maintain that the identification of Webb and Yancey as enemies was gleaned from information contained in the institutional files of these inmates during routine classification proceedings and that such information was true and correct at the time the defendants relied on this information.  The defendants further maintain that Webb's placement in segregation occurred solely due to his having a validated enemy in the general population of Bullock. The affidavits and evidentiary materials submitted by the defendants, including documents contained in the institutional files of inmates Webb and Yancey which were contemporaneously compiled during the numerous years of their incarceration, support the defendants' assertions.

"In the First Amendment context, . . . some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S.Ct. 1475, 1479 (2001), quoting *Pell*, 417 U.S. at 822, 94 S.Ct. at 2804.  In accordance with this principle, an inmate's rights established under the First Amendment, including the rights to voice complaints and file lawsuits, are not protected if allowing protection is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell*, 417

U.S. at 822, 924 S.Ct. at 2804.  Thus, while inmates retain certain constitutional rights protected by the First Amendment, these rights are limited by the fact of incarceration and valid penological objectives such as maintaining institutional security and order.  The law is well settled that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."  *Pell*, 417 U.S. at 823, 94 S.Ct. at 2804; *Bell v. Wolfish*, 441 U.S. at 546, 99 S.Ct. at 1878 ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees.").  It is therefore clear that preservation of security and order within a correctional facility is essential to the facility's effective administration and constitutes both a compelling and substantial governmental interest.  *Pell*, 417 U.S. at 823, 94 S.Ct. at 2804; *Lawson v. Singletary*, 85 F.3d 502, 512 (11th Cir. 1996); *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996).

"The first amendment prohibits state officials from retaliating against prisoners for exercising their right of free speech.  *See, e.g., Wright v. Newsome*, [795 F.2d 964, 968 (11th Cir. 1986)]. . . .  The gist of a retaliation claim is that a prisoner is penalized for exercising a right of free speech."  *Thomas v. Evans*, 880 F.2d 1235, 1241-1242 (11th Cir. 1989); *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003).  "In prison, of course, first amendment rights are not absolute.  *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).  Legitimate policies and goals of the correction system may justify restrictions limiting prisoners' [First Amendment] rights.  417 U.S. at 821."  *Adams v.*

*James*, 784 F.2d 1077, 1081 (11th Cir. 1986).  "A prisoner retains those First Amendment rights that are 'not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrective system.'  *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc*., 433 U.S. 119, 129, 97 S.Ct. 2532, 53 L.Ed.2d 629 (resist)) (internal quotation marks omitted). . . .  [P]rison authorities have a legitimate penological interest in the consistent enforcement of prison rules and . . . [placing an inmate in administrative segregation to ensure his safety] is reasonably related to that interest."  *Hargis v. Foster*, 312 F.3d 404, 409-410 (9th Cir. 2002); *see also Jackson v. Cain*, 864 F.2d 1235, 1248 (5th Cir. 1989). The situation is somewhat complicated when the alleged act of retaliation is undertaken to assure compliance with prison rules and regulations as inmates often attempt to "inappropriately insulate themselves from [such] actions by drawing the shield of retaliation around them."  *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied* sub nom *Palermo v. Woods*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996).

It is essential that federal courts "carefully scrutinize retaliation claims" brought by prisoners challenging adverse actions of correctional personnel.  *Woods*, 60 F.3d at 1166. "[C]ourts must approach prisoner claims of retaliation with skepticism and particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983).  This is [necessary because prisoners'] . . . claims of retaliation are . . . easily fabricated [and] pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.  This is so because virtually any adverse action taken against a prisoner by a prison official--even

those otherwise not rising to the level of a constitutional violation--can be characterized [by the prisoner] as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2nd Cir. 2001), overruled on other grounds, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To proceed on a claim for retaliation and avert the entry of summary judgment, an "inmate must establish . . . three elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [defendants'] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)." *Smith v. Webb*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Obiegbu v. Werlinger*, 581 F. App'x 119, 122 (3rd Cir. 2014); *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999). With respect to the causal relationship element, a prisoner must demonstrate that correctional officials intended to retaliate for his exercise of a right protected under the First Amendment and, but for the retaliatory motive, the adverse act complained of would not have occurred. *Woods*, 60 F.3d at 1166; *Smith*, 532 F.3d at 1278.

An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by showing "that his conduct was constitutionally protected and that this conduct . . . was a 'motivating factor'" behind the adverse action of the defendant. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. Merely alleging the ultimate fact of retaliation, however, is insufficient. *Cain v. Lane*, 857 F.2d 1139, 1142, n.6 (7th Cir. 1988); *Woods*,

60 F.3d at 1166.  Additionally, conclusory allegations are insufficient to demonstrate the existence of each element requisite to establishing retaliation.  *Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002), overruled on other grounds in *Porter v. Nussle*, 534 U.S. 516 (2002); *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (Because prisoner retaliation claims are prone to abuse, "we are careful to require non-conclusory allegations.").  If an inmate meets his burden with appropriate evidence, the burden of production shifts to the defendant to show that he "would have reached the same decision as to [the challenged adverse action] even in the absence of the protected conduct."  *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576.  "Under the *Mt. Healthy* approach, if the government official 'can prove that [he] would have taken the adverse action in the absence of the plaintiff's protected conduct, [he] cannot be held liable.'  *Thaddeus-X*, 175 F.3d at 388 n.4[.]"  *Smith*, 532 F.3d at 1278 n.22.

Webb alleges that the defendants fabricated an enemy situation and placed him in administrative segregation in retaliation for his filing a prior lawsuit with this court, thus satisfying the first element of his retaliation claim.  *Smith*, 532 F.3d at 1277.  The second element requires Webb to demonstrate that documentation of the enemy situation and his placement in administrative segregation "would likely deter a [prisoner] of ordinary firmness" from filing complaints challenging the behavior of correctional officers. *Id*.  This "presents an objective standard and a factual inquiry." *Id*.  The court assumes *arguendo* that this standard has been met.  Nevertheless, Webb fails to satisfy the third requisite

element of a retaliation claim - a causal connection between his constitutionally protected activity and the adverse actions of the defendants.

The causal connection inquiry focuses on the "subjective motivation of the defendants[,]" *Thaddeus-X*, 175 F.3d at 399, and this court must therefore determine "whether the defendants were subjectively motivated to discipline" Webb for filing a prior lawsuit.  *Smith*, 532 F.3d at 1278.  The subjective motivation issue is resolved by most courts under the burden-shifting formula set forth in *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977).  This formula requires that the plaintiff first meet "his burden of establishing that his protected conduct was a motivating factor behind any harm" and then "the burden of production shifts to the defendant.  If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399, referencing the *Mt. Healthy* motive analysis.

The defendants deny the allegations of retaliation and argue that the adverse actions about which Webb complains occurred solely in an effort to ensure his safety as institutional records established that he had a validated enemy within the general population of Bullock at the time his claims arose, not because he previously filed a lawsuit.  Webb offers only his conclusory allegation of ultimate fact that the defendants retaliated against him for filing a lawsuit.  This allegation is insufficient to defeat summary judgment. *Waddell*, 276 F.3d at 1279; *Holifield*, 115 F.3d at 1564, n.6.  The record before the court is devoid of admissible or potentially admissible evidence, direct or otherwise, from which

a reasonable fact finder could infer the requisite motivating factor element.   Additionally, the circumstances, when taken as a whole, do not support making such an inference.  Thus, Webb's retaliation claims falter on this element.  Moreover, even assuming a reasonable fact finder could infer the motivating factor element, it is clear under *Mt. Healthy* that correctional officials would have documented Yancey as Webb's enemy and placed Webb in administration segregation regardless of any prior lawsuit because of his having a validated enemy within the prison's general population during the relevant time period. *Turner*, 482 U.S. 91-92, 102 S.Ct. at 2262-2263.  "Objective prison administrators standing in [the defendants'] shoes would assume that [allowing inmates who are known enemies to remain in general population] . . . would be noised about the prison's population and, if ignored, could seriously impede their ability to maintain order and thus achieve the institution's penological objectives."  *Smith*, 532 F.3d at 1279.  In light of the foregoing, the defendants are entitled to summary judgment on the retaliation claims as Webb fails to establish by appropriate evidence a causal relationship between the alleged protected activity and the documentation of an enemy and/or his placement in administrative segregation.  *Id*. at 1278-1279.

## C.  Administrative Segregation

To the extent Webb maintains that his placement and temporary confinement in administrative segregation violated his right to due process, he is entitled to no relief.

Determining whether an inmate has been deprived of a liberty interest "within the scope of the Due Process Clause . . . is often a difficult determination . . . because prisoners

have **already** been deprived of their liberty in the ordinary sense of the term." *Bass v. Perrin*, 170 F.3d 1312, 1318 (11th Cir. 1999).   The Supreme Court has nevertheless identified two circumstances in which a prisoner, an individual already deprived of his liberty in the ordinary sense, can be further deprived of his liberty such that due process is required.

> The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court.  *See Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995); *see, e.g., Vitek v. Jones,* 445 U.S. 480, 492-93, 100 S.Ct. 1254, 1263-64, 63 L.Ed.2d 552 (1980) (holding that a prisoner is entitled to due process prior to being transferred to a mental hospital).  The second is when the state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300; *see, e.g., Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974) (prisoners may not be deprived of statutory "good-time credits" without due process); *cf. Dudley v. Stewart,* 724 F.2d 1493, 1497-98 (11th Cir.1984) (explaining how the state creates liberty interests).   In the first situation, the liberty interest exists apart from the state; in the second situation, the liberty interest is created by the state.

*Bass*, 170 F.3d at 1318.

The Constitution itself does not give rise to a liberty interest in avoiding temporary confinement in administrative segregation. *Sandin*, 515 U.S. at 485-486 (noting that confinement of inmate in disciplinary segregation for 30 days does not implicate a constitutionally protected liberty interest); *Rodgers v. Singletary*, 142 F.3d 1252, 1253 (11th Cir. 1998) (holding that confinement in segregation for two months did not deprive inmate of a constitutionally protected liberty interest); *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005) (punishments imposed upon the plaintiff-inmate due to a rule violation,

including demotion in status, placement in segregation and transfer to another facility raise no due process concerns.); *see also Meachum v. Fano,* 427 U.S. 215, 225 (1976) (No liberty interest arising from Due Process Clause itself in transfer from low-to maximum-security prison because "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose."). Thus, confinement of Webb in administrative segregation for eight days did not "exceed the sentence [imposed by the trial court] in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." *Id.* This court must therefore determine whether the actions about which Webb complains involved the deprivation of a state-created liberty interest as defined by the standard set forth in *Sandin*.

As the Supreme Court opined,

*Sandin* involved prisoners' claims to procedural due process protection before placement in segregated confinement for 30 days, imposed as discipline for disruptive behavior. *Sandin* observed that some of our earlier cases, *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), in particular, had employed a methodology for identifying state-created liberty interests that emphasized "the language of a particular [prison] regulation" instead of "the nature of the deprivation." *Sandin,* 515 U.S., at 481, 115 S.Ct. 2293. In *Sandin,* we criticized this methodology as creating a disincentive for States to promulgate procedures for prison management, and as involving the federal courts in the day-to-day management of prisons. *Id.,* at 482-483, 115 S.Ct. 2293. For these reasons, we abrogated the methodology of parsing the language of particular regulations.

"[T]he search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established in and applied in *Wolff* and *Meachum*. Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will generally be limited to

freedom from restraint which, while not exceeding the sentence in such an
unexpected manner as to give rise to protection by the Due Process Clause
of its own force, nonetheless imposes atypical and significant hardship on
the inmate in relation to the ordinary incidents of prison life." *Id.,* at 483-484,
115 S.Ct. 2293 (citations and footnote omitted).

After *Sandin,* it is clear that the touchstone of the inquiry into the existence
of a protected, state-created liberty interest in avoiding restrictive conditions
of confinement is not the language of regulations regarding those conditions
but the nature of those conditions themselves "in relation to the ordinary
incidents of prison life." *Id.,* at 484, 115 S.Ct. 2293.

*Wilkinson v. Austin*, 545 U.S. 209, 222-223, 125 S.Ct. 2384, 2393-2394 (2005).

Applying the *Sandin* inquiry, it is clear that confinement of Webb in administrative
segregation for eight days "does not represent a dramatic departure from the basic
conditions" of the sentence imposed upon him and such confinement failed to "impose[]
atypical and significant hardship on the inmate in relation to the ordinary incidents of
prison life." *Id.* at 484-485.  Thus, no state created interest existed regarding the temporary
placement of Webb in administrative segregation.

Consequently, due process did not attach to the decision to confine Webb in
administrative segregation for eight days and summary judgment is therefore due to be
granted in favor of the defendants on this claim.

**D.  Custody Classification**

With respect to Webb's claim that the defendants denied him placement in a more
favorable custody classification, this claim provides no basis for relief.   The law is well
settled that

there are only two instances when a prisoner may be deprived of a due
process liberty interest under § 1983:  The first is when a change in the

> prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court.  The second situation is when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.  *Kirby v. Siegelman*, 195 F.3d 1285, 1290-91 (11th Cir. 1999) (quotation omitted) (citing *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).

*Morales v. Chertoff*, 212 F. App'x 888, 890 (11th Cir. 2006).

Webb's claim fails to implicate either of these situations because his assigned custody classification is not "so severe that it essentially exceeds the sentence imposed by the court," and the administrative regulations governing classification "do not bestow a benefit vis-a-vis the custody classification, the deprivation of which would result in an 'atypical and significant hardship' on [Webb].  *See Kirby*, 195 F.3d at 1290-91; *see also Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir.1994) (in the context of a claim based on a custody classification, holding that the U.S. Constitution affords no liberty interest in a prisoners custody classification); *cf. Meachum v. Fano*, 427 U.S. 215, 224-26, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (holding that a prisoner does not have a liberty interest in an assignment to any particular prison, regardless of whether the conditions of one prison are 'much more disagreeable' than another)."  *Morales*, 212 F. App'x at 890.

As is clear from the foregoing, a state inmate has no constitutionally protected interest in his classification status.  *Sandin*, 515 U.S. at 484; *Morales*, 212 F. App'x at 890; *Slezak*, 21 F.3d at 594.  Consequently, correctional officials may assign Webb to any classification level without implicating the protections of due process.  For the foregoing

reasons, Webb is due no relief on his claim challenging the constitutionality of the procedures undertaken in determining his classification level.

### E.  Violation of Internal Regulations

Insofar as Webb asserts that the defendants violated their internal procedures during the classification proceedings, he is entitled to no relief.   The law is well-settled that infringements of agency rules, regulations or procedures do not, without more, amount to constitutional violations.  *Sandin*, 515 U.S. at 484-486; *Magluta v. Samples,* 375 F.3d 1269, 1279 n. 7 (11th Cir. 2004) (mere fact governmental agency's regulations or procedures may have been violated does not, standing alone, raise a constitutional issue); *Myers v. Klevenhagen,* 97 F.3d 91, 94 (5th Cir. 1996) (claim that prison officials have not followed their own policies and procedures does not, without more, amount to a constitutional violation); *United States v. Caceres,* 440 U.S. 741, 751-752 (1979) (mere violations of agency regulations do not raise constitutional questions); *Weatherholt v. Bradley,* 316 F. App'x 300, 303 (4th Cir. 2009) (same); *see also Riccio v. Cnty. of Fairfax,* 907 F.2d 1459, 1459 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by its law is not a federal violation). For these reasons, the defendants are entitled to summary judgment on Webb's claim alleging a violation of internal regulations.

### V.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motion for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that on or before February 6, 2017 the parties may file objections to this Recommendation.   A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.   Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.   11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

Done this 23rd day of January, 2017.

/s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE